Vincent HUNTER, Petitioner,

v.

Walter FOGG, Superintendent of Eastern Correctional Facility, Respondent.

No. 78 Civ. 5834 (CHT).

United States District Court,
S. D. New York.

May 2, 1979.

Vincent Hunter, pro se.

Robert Abrams, Atty. Gen. of the State of New York by Charles A. Bradley, Asst. Atty. Gen., New york City, for respondent.

## OPINION

TENNEY, District Judge.

Petitioner Vincent Hunter is currently a prisoner of the State of New York serving a five-to-ten-year sentence arising from his plea of guilty to first-degree manslaughter before Justice Burton S. Roberts in Supreme Court, New York County. Hunter had been indicted for murder, and the manslaughter charge was the result of a plea bargain that included the imposition of an agreed-upon sentence of zero to ten years. The five-year minimum was set by the New York State parole board which, pursuant to New York Corrections Law § 805(2), had unfettered discretion to set a minimum

term where the sentencing judge had not done so.[1]

Hunter now claims that his plea was not voluntary and informed within the meaning of *Kercheval v. United States*, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927) (defendant who pleads guilty must do so "voluntarily after proper advice and with full understanding of the consequences"). He asserts that his attorney, Chester L. Mirsky, never told him about section 805(2) and the consequences thereof, and that the attorney actively misinformed him by stating that Hunter's minimum sentence would be one-third of the maximum. Mr. Mirsky has submitted an affirmation to the Court which confirms in many crucial respects Hunter's claim of sentencing misinformation. Mirsky states that at the time the crime was committed, Hunter had a record that included a prior felony conviction of a type that met the definition of "predicate felony" by the terms of New York Penal Law § 70.06. That statute contains graded sentencing norms based on the severity of the new felony, and it requires that the predicate felon serve one-half of the new sentence. Hunter was much concerned that this mandate would be applied to him. However, section 70.06 took effect on September 1, 1973, three days after Hunter killed his victim. Both his attorney and Justice Roberts assured Hunter that he could not be exposed to treatment as a predicate felon; that is, that he would not by that avenue be required to serve five years of the maximum ten imposed. Affir-

1. Section 805(2) states in pertinent part:

2. In any case where a person is received in an institution under the jurisdiction of the state department of correction with an indeterminate sentence, and the court has not fixed the minimum period of imprisonment, the board shall cause to be brought before one or more members not sooner than nine months or later than one year from the date the term of such sentence commenced all information with regard to such person . . as may have been compiled. The member or members receiving such information shall study same and shall personally interview the sentenced person. Upon conclusion of the interview, such member or members shall make a determination as to the minimum period of imprisonment to be served prior to parole consideration. Such determination shall have the same force and effect as a minimum period fixed by a court, except that the board may at any time make subsequent determinations reducing such minimum period provided that the period shall in no case be reduced to less than one year. . . .

In any case where the minimum period of imprisonment is fixed, pursuant to this subdivision, at more than one-third of the maximum term, or at more than three years from the date the sentence commenced, whichever is less, such determination shall be deemed tentative and shall be reviewed by the entire board as soon as practicable.

mation of Chester L. Mirsky, dated Jan. 24, 1978, ¶ 6 ("Mirsky Aff.") (originally submitted in *People v. Hunter,* Index No. 4047/74); June 14, 1976 Plea Minutes ("PM") at 19.

Mirsky also confirms that he never told Hunter of the parole board's authority to set a minimum sentence anywhere up to the maximum; indeed, he states that he "indicated [to Hunter] that one year would be the earliest possible eligibility date for parole," based on his erroneous understanding that the "minimum period of imprisonment that he might anticipate serving prior to parole consideration . . . was . . . a period of one-third of the maximum term," and the fact that Hunter had already served over two years in jail awaiting the disposition of this and other cases, time which would be credited to Hunter on the new manslaughter plea. Mirsky Aff. ¶¶ 5, 6. Finally, Mirsky supports Hunter's contention that all through the plea negotiations he was especially concerned with the minimum time he would have to serve, and Mirsky opines that Hunter would not have pleaded guilty knowing that five years of jail time was a possible consequence of his plea.

### Discussion

Hunter supports his claim of an unconstitutional plea by citing two recent decisions of the United States Court of Appeals for the Second Circuit. In *United Stated ex rel. Leeson v. Damon,* 496 F.2d 718 (2d Cir.), cert. denied, 419 U.S. 954, 95 S.Ct. 216, 42 L.Ed.2d 172 (1974), the defendant sought to withdraw a guilty plea given in the misapprehension that his maximum sentence would be two-and-a-half years when, as a

first offender under thirty years of age, he was also subject to a statute providing for a term of up to five years. The trial judge rejected the motion to withdraw the plea, characterizing the case as one of "unwarranted assurance by counsel, rather than a case of lack of knowledge of the consequences of the plea." *Id.* at 720. Applying the rule of *Kercheval, supra,* the federal panel found that Leeson's plea was invalid because it was "not knowing and . . . entered in ignorance of its direct consequences." *Leeson, supra,* 496 F.2d at 721.

That the same reasoning applies to sentencing minima as to maxima was settled in *United States ex rel. Hill v. Ternullo,* 510 F.2d 844 (2d Cir. 1975). There the defendant relied on statements by his attorney to the effect that the maximum time he could receive on his guilty plea was four years, and that with good behavior the defendant would be released after two-thirds of the minimum time. Both statements were erroneous. Citing *Leeson,* the *Hill* court restated the proposition that a plea of guilty is not deprived of the requisite intelligence and volition when it is influenced by an attorney's mistaken estimate of possible sentence, but that the plea may well be void where counsel has failed correctly to inform the defendant of statutory sentencing possibilities. The *Hill* court reasoned that knowledge of the minimum time to be served is not "necessarily less significant to a defendant's decision to plead guilty, than an error about a statutory maximum. In both instances, counsel is not being second-guessed about a prediction that has proven inaccurate but, rather for a misstatement of easily accessible fact." *Id.* at 847.[2]

---

**2.** Respondent argues that review for a voluntary and intelligent plea implicates the often quoted constitutional standard for ineffective counsel, that is, representation so inadequate "as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." *United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed.2d 586 (1950). That was the approach taken by the dissent in *Leeson, supra,* 496 F.2d at 722–23, and specifically rejected the following year by the unanimous court in *Hill.* Writing for the *Hill* panel, Circuit Judge

Smith cited *Leeson* for the proposition that counsel's failure to advise his client properly on maximum and minimum sentences is counsel's error and requires relief, but stated that

[v]acating a plea on the basis of such incompetence, though, need not rest upon a finding that the defendant has been deprived of his Sixth and Fourteenth Amendment right to the effective assistance of counsel. The focus in this instance is not counsel's effectiveness per se but, instead, his client's understanding of the consequences of the plea—an understanding which counsel, along with the

■ The respondent argues that knowledge of the parole board's discretionary power to sentence is not the sort of statutory sentencing information that is requisite to an informed guilty plea, suggesting that imposition of sentence by a court is a function entirely separate from the activities of a parole board. The respondent reasons that prior to Hunter's appearance before the board and until the minimum was fixed, no one could "predict" what Hunter's minimum sentence would be, and, therefore, that Hunter's attorney was engaging in mere speculation when he told the petitioner that the minimum sentence would be one-third of the maximum. Finally, the respondent seeks to distinguish *Leeson* and *Hill* by reciting that the former deals with maximum prison terms and the latter deals with *statutory* minimums, an analysis that ignores both the jurisprudential significance of *Leeson* and *Hill and* the fact that the parole board's sentencing authority is statutory.

The respondent relies on *Dioguardi v. United States,* 587 F.2d 572 (2d Cir. 1978), to support the theory that the activities of a court and those of a parole board are entirely separate and autonomous. The Court finds *Dioguardi* entirely inapposite here. There the federal prisoner had been denied parole under stringent guidelines promulgated after he was sentenced. He argued that the new criteria frustrated the intent of the sentencing judge who must have had the old guidelines in mind when he passed sentence. The court disagreed and refused to encroach on the federal Parole Commission's authority to grant or deny parole pursuant to its own rules, stating that the decision to grant or deny parole is not part of the sentencing process.

Clearly the grant or denial of parole is a matter entirely distinct from the state having vested in its parole board the authority to set the minimum sentence in lieu of the trial judge. The latter activity is patently part of the sentencing process and Hunter's

challenge is not to the terms of the parole board's decision but to the validity of a plea purportedly taken in ignorance of the board's power to make that decision. It would violate both logic and justice to say that a defendant who pleads guilty to a judge-imposed minimum sentence is entitled to know before he pleads how much of that term he must in all events serve, but that the defendant whose minimum time will be set by the parole board is not similarly entitled to know that he takes his plea in the dark.

■ However, in spite of this Court's conclusion that Hunter had a right to accurate information about the exact scope of possible sentence, the fact that he received some misinformation and was uninformed of more is not dispositive of his claim.

> [T]he proper test for determining the constitutional validity of a state court guilty plea in the event of sentencing misinformation is whether the defendant was aware of actual sentencing possibilities, and, if not, whether accurate information would have made any difference in his decision to enter a plea.

*Caputo v. Henderson,* 541 F.2d 979, 984 (2d Cir. 1976); *accord, Williams v. Smith,* 591 F.2d 169 (2d Cir. 1979).

The first prong of the *Caputo* test requires the Court to assess whether Hunter had actual information about his exposure to the sentencing discretion of the parole board despite the fact that his attorney failed to inform him of it and misinformed him about a minimum sentence period. This Court has no reason to believe that Hunter was better informed than his attorney about matters of law, *see Williams v. Smith, supra,* 591 F.2d at 172. Moreover, the plea minutes reveal that Justice Roberts took great pains to put on the record that while Hunter could not be punished as a predicate offender for this homicide, his guilty plea to this crime would make him a

---

court, of course bears a heavy burden to ensure.
*United States ex rel. Hill v. Ternullo, supra,* 510 F.2d at 847 n.5. This Court, therefore, declines

to assess counsel's efforts by the sixth amendment standard.

predicate offender for a future felony and would then expose him to half the maximum sentence. Nowhere in the plea hearing was Hunter informed that the minimum sentence for this crime would be determined by the parole board, and nowhere was he told that he now risked—for all practical purposes—the same sentence as— or worse than—a predicate felon's.[3]

The second part of the *Caputo* test for constitutional validity of a guilty plea is whether accurate information as to the sentencing possibilities would have caused Hunter to plead differently. In *Williams* that determination was made by measuring the disparity in sentence between the crime charged and the one pleaded to, by assaying the strength of the state's case, and by exploring the legal options open to the defendant at the time of his plea. *Id.*, 591 F.2d at 172–73. On the particular facts the court endorsed the holding of the district court that the defendant would have pleaded guilty even if fully aware of the consequences and that the plea was therefore constitutionally valid. Using the same indices as did the *Williams* court, this Court concludes otherwise.

A review of the plea and sentence minutes in this case reveals a scenario in which Hunter shot an acquaintance named John Powers in a social club at about 11:30 A.M. on August 29, 1976. There was evidence that the petitioner and Powers had been up all night, possibly drinking and perhaps arguing over some cocaine that Hunter had for his own use. At the opening of the plea hearing, the defense moved to challenge the lack of instruction to the grand jury on the subject of extreme emotional disturbance, New York's affirmative defense that permits a jury weighing a homicide charge to convict for manslaughter instead. *See* N.Y. Penal Law § 125.25(1)(a) (McKinney 1975). Justice Roberts refused to dismiss the indictment, stating that "there is no affirmative obligation on the part of the People to present to the grand jury evidence dealing with a possible affirmative defense of extreme emotional disturbance." PM at 6. Nevertheless, he accepted the defense characterization of the crime as "apparently an unplanned relatively spontaneous occurrence" and himself added "[r]esulting possibly from an overindulgence in alcohol and as the result of an argument and in a heat of passion situation . . .," to which the District Attorney replied "[t]he evidence could lend itself to that interpretation, your Honor." *Id.* at 16. This dialogue stands in contrast to the *Williams* court's thesis that Williams himself thought it "far-fetched" that he would be acquitted after a trial on the indicted offense, and therefore would have had little incentive to plead not guilty to the more serious offense. *Id.*, 591 F.2d at 173. In this case, moreover, the court and the prosecution discussed the weakness of the case on the record. Upon being asked why he was willing to have Hunter plead to the lesser charge of manslaughter, the prosecutor alluded to the apparent spontaneity of the crime, and Justice Roberts added: "I think you should state for the record that the time has passed and possibly the case is not as strong now as it

---

**3.** The Court does not think it significant that at virtually the last moment before imposing sentence Justice Roberts alluded to the parole board's discretion, saying:

> The sentence that the Court is going to impose is an indeterminate sentence, and that indeterminate sentence enables you to appear before a parole board at an early date. *Whether they parole you or not is up to them*, and this Court makes absolutely no recommendation one way or another.
>
> The Court feels there should be a hold upon you to prevent you from engaging in criminal activities in the future. So whatever the *action of the parole board is, if they intend not to keep you for the maximum*

> *period of time, which appears highly unlikely because they don't keep very many for the maximum period of time*, but there should be a hold upon you, supervision with regard to your activities so that you do not engage in illegal activities . . . .

Sentence Minutes at 32 (emphasis added).

This statement was made as part of a lengthy sentencing speech long after plea bargaining had been consummated and five weeks after the plea was entered. Since the thrust of precedent is directed at the act of pleading and not at the later receipt of sentence, the conversation at the plea hearing is the crucial dialogue by which to measure an informed and knowledgeable plea.

was during the early stages following the indictment." The prosecutor responded: "Your Honor, that is a very strong motivating factor in this case." *Id.* at 16–17.[4]

Finally, on the matter of available legal options and penalties, the question in *Williams* was the application of New York's persistent felony offender statute. N.Y. Penal Law § 70.10 (McKinney 1975 & Supp. 1978). That statute calls for a finding by the sentencing judge that the persistent felon is in need of extended incarceration and, upon such finding, permits the court to impose a minimum term of 15 years and a maximum of life. In *Williams* the habeas court reasons that the petitioner would not have been in any better position if he knew that he could get persistent offender treatment, because whether he pleaded guilty or went to trial and was convicted he would not know until afterward whether the judge would sentence him pursuant to section 70.10. Hunter, on the other hand, knew the scope of the sentence being offered—if not its implication—and could assess it against the penalty he risked if convicted of murder by a jury. That verdict would carry with it a minimum prison term of at least 15 years and at most 25, and a maximum term of life in prison. However, assuming that Hunter was able to carry the burden of proving extreme emotional disturbance, conviction on that lesser included offense would carry a minimum term of at least one year and not more than eight-and-a-half, and a maximum term of at least three years and at most 25.[5] The Court finds it reasonable to conclude from the Plea Minutes that Hunter thought he had a strong chance for the lesser conviction. The actual sentence Hunter got, *i. e.*, a minimum of five and a maximum of 10, was well within what he might have expected after an unfavorable manslaughter jury

---

4. Later on in the plea hearing Justice Roberts reiterated his reasons for permitting a plea to the lesser, manslaughter offense:

> [T]he Court has stated that as a result of the facts presented to this Court by the district attorney (one) that the action [*i. e.*, crime] may have occurred as the result of an overindulgence in alcohol and possibly an overindulgence in the sniffing of cocaine, (two) that there are certain weaknesses within the Peoples' case in so far as certain witnesses are no longer present to testify in this matter. PM at 26.

Some several minutes later, at the end of the hearing, the District Attorney stated: "Before we get to the date of sentence, I do think, so the Court is not laboring under any misapprehension [sic], that between the last adjournment and the present adjournment, the People have managed to locate additional witnesses who were present. Justice Roberts responded, and the following colloquy ensued:

> THE COURT: I'm sure you can establish the case. The Court wouldn't take the plea if you couldn't establish the case.
>
> The reason for the fact that the Court is willing to accept a plea, a sentence which is somewhat less than the maximum, is the fact that this case does have certain weaknesses, and as a result it is far better, again to use certain proverbs—it's not necessarily from the street—a bird in the hand is worth two in the bush. Am I correct?
>
> MR. SULLIVAN: Yes, Your Honor. We share the same thing. I did want to get that on the record so there would be no claim of misrepresentation in the future.

> THE COURT: It's not due to Mr. Hunter's salutary work in the community, as a hard-driving, law-abiding citizen. It's being done because of the fact you feel that the community can best be protected by having a plea in this case, rather than taking the chances of going to trial.
>
> Mr. Hunter, on the other hand, is not giving you this plea because he feels a sense of reformation and a desire to express contriteness, but does so because he too recognizes that in rolling the dice, that the dice may very well come up in a trial snake eyes and produce the sentence which would be far in excess of the sentence which has been obtained as a result of the plea and sentence.
>
> MR. MIRSKY: I should indicate that Mr. Sullivan has indicated to me, and I've indicated to Mr. Hunter, that there are four witnesses which are available in this case to testify this time, and the defendant has considered that in determining what to do in this matter, as well as the fact that this case is three years old.
>
> THE COURT: He has waived his right to go to trial by taking the plea.

5. At the time of Hunter's sentencing on July 21, 1976, New York Penal Law § 125.25 provided that second-degree murder, the charge on which Hunter was indicted, was a class A–1 felony, and section 125.20 provided that manslaughter in the first degree was a class B felony. Penal Law § 70.00 prescribed the sentencing formulae for these crimes that is referred to in the text.

verdict. Therefore, this Court credits Hunter's assertion that he would have taken his chances on a trial had he known a plea would carry such a stiff sentence.

■ Although it is common in the face of a successful habeas petition for the habeas court to hold an evidentiary hearing before determining what relief must be granted, that measure is discretionary. Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts. The only directive to the court is to "make such disposition of the petition as justice shall require." *Id.* In *Leeson* the court found it unnecessary to remand this case for a hearing to determine whether appellant did not know his maximum possible sentence, for the appellant's contentions as to his ignorance are not disputed by the State. Moreover, appellant's original counsel has submitted an affidavit which supports appellant's own version of the facts with which, indeed, as we view it, the sentencing judge did not disagree. *Id.,* 496 F.2d at 722. A similar set of facts exists here. The State does not dispute that Hunter was uninformed about the authority of the parole board; it merely urges that he had no right to that information on the theories discussed, *supra.* Furthermore, as in *Leeson,* this Court has the benefit of his attorney's affirmation under penalty of perjury that Hunter's version of events is true in crucial respects. Finally, the Court has in hand a two-page written opinion, dated Feb. 1, 1978, of Justice Roberts denying Hunter's motion to set aside his conviction pursuant to N.Y.C.P.L. §§ 440.10, .20 and .30 (McKinney 1971). Justice Roberts wrote:

Vincent Hunter, a man with a lengthy criminal record and no novice to the courtroom, engaged in lengthy negotiations preceding this plea.

In the plea minutes the defendant was informed by the Court that he might receive an indeterminate sentence of up to ten years (Minutes of Plea, pp. 17–18, 26–27.)

The defendant acknowledged that he understood the sentencing scope (Minutes

of Plea, p. 27.) Specifically, the defendant conceded, on the record, that there were no off the record promises as to the length of his sentence (Minutes of Plea, p. 29.)

At the sentencing proceeding on July 29, 1976, the Court lived up to the plea bargain. It imposed an indeterminate sentence not to exceed ten years—and, indeed, the Court made it clear to the defendant that his release from prison was up to the Parole Board. (Minutes of Sentence, pp. 32–33.)

From this it can be observed that apart from his perception that Hunter was wise in the ways of courts and prisons, Justice Roberts does not disagree that the only time the Court "made it clear to the defendant that his release from prison was up to the Parole Board" was at the sentencing and not at the plea. As for Hunter's pro forma acknowledgments that he understood the sentencing scope and that there were no off-the-record promises about sentence, these are "not of controlling weight or significance . . . [since this is the] standard answer to be given to that question, even though a plea bargain had been made." *Mosher v. LaVallee,* 351 F.Supp. 1101, 1107 (S.D.N.Y.1972), *aff'd,* 491 F.2d 1346 (2d Cir.) (per curiam), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974). In the Court's opinion there is no need for an evidentiary hearing in this case.

■ Hunter has asked for relief in the form of that evidentiary hearing or as permission to withdraw his plea. Petition (unpaginated). However, the Court has also been informed by both petitioner and respondent that Hunter was scheduled to be evaluated for release by the parole board yesterday, May 1, 1979. There are, of course, no guarantees that he will shortly be released and, even if paroled, he would still be "in custody" within the meaning of the writ. *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). Therefore, in view of the somewhat unusual circumstances, the Court deems it equitable that the State courts determine whether Hunter should be permitted to withdraw his

plea of guilty to first degree manslaughter and stand trial for the murder with which he was originally charged, or to have his sentence reduced to time served. That option belongs to the State, *cf. Mosher v. LaVallee*, 446 F.Supp. 64 (S.D.N.Y.1978), and therefore respondent is directed to release the petitioner unless the State commences trial proceedings against Hunter within 60 days.

So ordered.